Samuel ROBINSON, Appellant
(Defendant below),

v.

STATE of Indiana, Appellee
(Plaintiff below).

No. 783S269.

Supreme Court of Indiana.

Dec. 26, 1985.

Susan K. Carpenter, Public Defender of
Indiana, C.H. Gardner, Deputy Public De-
fender, Indianapolis for appellant.

Linley E. Pearson, Atty. Gen., Michael B.
Murphy, Deputy Atty. Gen., Indianapolis,
for appellee.

PIVARNIK, Justice.

Defendant-Appellant Samuel Robinson
was found guilty but mentally ill of murder
by a jury on January 13, 1983, in the Elk-
hart Superior Court. He subsequently was
sentenced to a term of thirty (30) years by
the trial judge, who also recommended he
be transferred to a psychiatric institution.

Three issues are presented for our con-
sideration in this direct appeal:

1. denial of Appellant's motion to sup-
   press;
2. sufficiency of the evidence; and
3. improper admission of the testimony of
   Police Officer Clark.

On March 4, 1982, the body of Charles
Boswell was discovered in his rented room
at a boarding house located at 219 West
Blaine, Elkhart, Indiana. The cause of
death was determined to be a single stab
wound to the chest. Death occurred ap-
proximately two to three days prior to this
discovery. When investigating police de-
tectives arrived at the boarding house they

encountered Defendant Samuel Robinson, who lived in a room as a boarder at the same boarding house.

The police observed that Defendant continually attempted to go into the room where the body was and appeared extremely nervous to the police officers. He told them that he and the decedent were friends. When questioned, Defendant was hesitant in responding. Throughout this investigation it was the opinion of the police officers that Defendant's nervousness did not appear to them to be caused by his being under the influence of alcohol or drugs. The police officers did observe his conduct to be suspicious and Captain Michael Coryn asked the defendant to come down to the police station to give a statement. Defendant agreed to go but went to his room to get his coat and closed the door behind him. When Officer Coryn knocked on the door, Defendant opened it and just stood there, said he wanted to talk, and invited Detective Coryn into the room. Detective Coryn entered the room and asked Defendant if he knew how Decedent met his death, to which Defendant suggested a drug overdose, but later said Decedent did not use drugs. Coryn noticed a bag of marijuana on Defendant's coffee table. Defendant seemed to become more and more agitated and nervous and stated to the officer that the deceased was "strange." Coryn became more suspicious of the defendant and read him his *Miranda* rights. Defendant started to walk out of the room, crying, at which time Coryn advised the other officers to escort the defendant to the police station and that he was under arrest for possession of marijuana. Defendant was escorted to the police station by Detective William Endler, who noticed that Defendant was extremely nervous en route to the station.

Defendant made statements to many of the officers at different times in which he gave varying versions of what actually happened. At one point he said that he and the decedent had gotten into a fight and the decedent knocked Defendant down. At times he would stop talking and stare at the ceiling or floor for thirty seconds to a minute and then speak for five to ten seconds as if he were reliving the incident. At one point Defendant asked Detective Arthur Kern for help, to which the Detective said he would if he knew what the defendant wanted, but Defendant did not respond. Each time one of the officers talked to Defendant, the *Miranda* rights were read to him with full explanation of their meaning. The police officers all testified they had no doubt that Defendant understood these rights and knowingly waived them, indicating that he was willing to talk to them. Defendant admitted stabbing the decedent after a fight and gave three different accounts of what he did with the knife. In a final statement, Detective Ivory read the statement back to Defendant and Defendant signed each page, initialled the first and last word of each page, and did not indicate he wanted to make any changes. The defendant indicated he had not told the entire truth at the preceding interrogation and wanted to set the record straight. Defendant's brother, Ernest Robinson, was present at this time and encouraged Defendant to tell the truth. Defendant then indicated that he and the decedent had had a homosexual relationship and that Decedent had taken up with another man. Because of this, the fight ensued between Defendant and Decedent, culminating in the stabbing incident. Defendant told his brother in the presence of the officers that he fully understood his rights and was telling the truth. All of the officers testified that Defendant appeared to know what he was doing, understood his rights, knowingly waived them, and was not under the influence of alcohol or drugs.

Defense witness Dr. Robert Price, a psychiatrist acquainted with the defendant since 1973, testified that the defendant has a psychiatric condition coupled with drug addiction problems. He stated at the suppression hearing that Defendant's confused state was "readily apparent" some of the time, "extremely obvious" other times, and "very difficult" to determine at still other times. He did state that it was extremely apparent in a stressful situation. Dr.

Price's conclusion was that the defendant was insane on March 4, 1982. Court appointed psychiatrist Gerald Kauffman stated that in April, 1982, he believed Defendant knew what he did was wrong, but in January, 1983, a week before the trial, Dr. Kauffman changed his evaluation to that of insanity. Court appointed psychiatrist Lawrence K. Musselman testified his conclusion was that Defendant appreciated the seriousness of what he had done but doubted the defendant could conform his acts with the law. Dr. Musselman further testified that it is extremely difficult after the fact to evaluate the sanity of a defendant. He stated there is no certainty, and that people who have observed an individual at the time of the crime or very shortly thereafter are much better judges of what the individual's state of mind was at that time, whether they be laymen or professionals. Several of the police officers testified that although the defendant appeared nervous and gave varying versions of the incident, this was not unusual and was, as a matter of fact, normal conduct for people in these circumstances.

## I & II

We consider issues I & II together because they are based on similar contentions of Appellant.

Appellant claims the trial court violated his constitutional rights under the Indiana and United States Constitutions by allowing into evidence his verbal and written statements obtained by the police, because Appellant lacked sufficient mental capacity to understand his rights and the consequences of waiving them. Appellant maintains there is therefore no probative evidence to support the trial court's findings that these statements were made knowingly and voluntarily. His contentions are based on the testimony of the three psychiatrists and the indications of his behavior demonstrated in the testimony of the police officers. He claims the State had a heavy burden to overcome in proving Appellant knowingly and voluntarily waived his rights and that the State did not carry this

burden since it was apparent by the above indicated testimony that the State was able to overbear the will of Appellant due to his insane condition. Defendant cites *Brady v. United States* (1970), 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747; *Fleenor v. State* (1980), 274 Ind. 473, 412 N.E.2d 778, *reh. denied* (1981); *Hall v. State* (1971), 255 Ind. 606, 266 N.E.2d 16.

We review this issue with the same standard we use for any other general sufficiency question. *Mays v. State* (1984), Ind., 469 N.E.2d 1161, 1165. That is, we will not reweigh the evidence nor determine the credibility of witnesses, but rather, will look to the evidence most favorable to the State, together with all reasonable inferences therefrom. If there is substantial evidence of probative value to support the jury's finding, such will be upheld. *Harris v. State* (1985), Ind., 480 N.E.2d 932, 937. Here, the evidence was conflicting as to the knowing and voluntary character of Defendant's waiver of his rights and the giving of his statements. Although the testimony of the psychiatrists was that Defendant was insane, this evidence was contradicted by the testimony of the investigating officers. Where evidence is conflicting, the trier of fact may reject the defendant's version and adopt that version they find to be the most creditable. *Hill v. State* (1979), 271 Ind. 549, 552, 394 N.E.2d 132, 135. There was sufficient evidence presented here to support the finding that Appellant possessed the requisite mental capacity to knowingly and voluntarily waive his rights. Each of the officers who observed Appellant and interrogated him stated that he appeared to act knowingly and voluntarily and to fully understand what he was doing. They said that although he acted nervous and hesitant, his conduct was similar to conduct they observed in hundreds of suspects in other cases, and therefore did not find it unusual or indicative of insanity or the influence of alcohol or drugs. Furthermore, Appellant told his brother he understood what he was doing and his brother shared the opinion of the officers regarding Defendant's mental

condition. The trial court therefore did not err in overruling Defendant's motion to suppress the statements and confessions on these grounds and permitting them to be submitted to the jury. *Cummings v. State* (1979), 270 Ind. 251, 253, 384 N.E.2d 605, 606.

In a similar vein, Appellant maintains the verdict of the jury was contrary to law since the evidence was without conflict that Appellant was legally insane at the time of the offense. Again Defendant refers to the testimony of the psychiatrists.

A defendant who enters a plea of insanity has the burden of proving such by a preponderance of the evidence. Ind. Code § 35–41–4–1(b) (Burns 1985). Where the party having the burden suffers a negative judgment, as Appellant did here, he has the further burden, if he seeks to upset the finding of the trier of fact, of showing that the evidence is without conflict and leads to but one conclusion and that conclusion is opposite to the one reached by the trier of fact. *Turner v. State* (1981), Inc., 428 N.E.2d 1244, 1246. As we already have pointed out, such is not the case here. Although the testimony of the experts created a conflict, the total record presented ample evidence from which the jury could find or infer that Appellant was sane at the time he committed this crime. *Taylor v. State* (1982), Ind., 440 N.E.2d 1109, 1110. Appellant would have us distinguish *Taylor* from the instant case, since in *Taylor* the lay testimony was from eyewitnesses to the crime, while in the instant case the lay testimony was from officers who did not view Appellant at the time of the crime, but did so a couple of days later. This distinction, of course, goes to the weight of the officer's testimony and not its failure to present probative evidence. The testimony regarding Appellant's attitude and condition at the time of his encounter with the police, although observed a day or two after the commission of the crime, allowed the jury to draw an inference as to Appellant's sanity at the time he committed the crime. In *Green v. State* (1984), Ind., 469 N.E.2d 1169, 1172, we approved of the testimony of an investigating officer regarding the defendant's behavior after the day of the crime where such testimony served to rebut expert psychiatric testimony regarding insanity. Here, one of the expert witnesses, Dr. Musselman, stated that the best judges of Appellant's sanity are those who observed him at the time of the offense or shortly thereafter, whether they were professional persons or lay people. Appellant's confession here indicated that he encountered the decedent concerning their broken relationship, went back to his room and got a knife, returned to the decedent's room where he fought with him, and finally stabbed and killed him, then returned to his own room, methodically washed off the knife, and put it away. There were ample facts from which the jury could reasonably conclude that Appellant was sane at the time of the crime based on all of the evidence before them. We find no error on this issue.

### III

Appellant claims the trial court improperly allowed Officer Clark to give his opinion as to Appellant's sanity on the date of the killing, March 2, 1982, based upon Clark's interview with Appellant on March 5, 1982. The record shows, however, Appellant failed to make a timely objection or motion to strike the answer given when this question was asked and answered. The failure to complain of alleged errors at trial in a timely fashion results in waiver of the issue. *Suggs v. State* (1981), Ind., 428 N.E.2d 226, 229, *reh. denied* (1982); *McCraney v. State* (1981), Ind., 425 N.E.2d 151, 153. The only objection made by Appellant in this line of questioning to this witness, was made when Officer Clark was asked his opinion of the sanity of Appellant on March 5, 1982, when he was being interviewed by Clark. Appellant's only objection at this point was one of relevance of that date. The trial court overruled that objection and the officer was permitted to answer. No further objections were made as to the officer's opinion regarding the date of March 2, 1982, so no question is

presented on that issue. *Blackmon v. State* (1983), Ind., 455 N.E.2d 586, 591; *Woods v. State* (1978), 267 Ind. 581, 582, 372 N.E.2d 178, 179.

Finding no error, we affirm the trial court.

All Justices concur.